CASE 84—PETITION EQUITY—NOVEMBER 22.

# Watson and others vs. Avery and others.

APPEAL FROM LOUISVILLE CHANCERY COURT.

1. When the action of an ecclesiastical court, on a matter of purely ecclesiastical cognizance, is drawn in question in the secular courts, *the principle is certainly true, in a qualified sense,* that the secular tribunal must accept as final and conclusive the decision of the ecclesiastical court, even if wrong, without inquiry as to the grounds or reasons for such decision.

2. Although the authorities agree that the civil courts cannot, upon the merits, overhaul the decisions of ecclesiastical judicatories in matters properly within their province (*Robertson vs. Bullions*, 9 *Barbour*, 134; *German Reformed Church vs. Seibert*, 3 *Barr.*, 291; *Shannon et al. vs. Frost*, 3 *B. Mon.*, 258), they do not establish the principle that where an ecclesiastical body or tribunal has transcended its authority and attempted to adjudicate a matter as to which it had no jurisdiction, such adjudication was, nevertheless, conclusive in a civil court. But, in most of the decisions, an express or implied reference is made to the jurisdiction of the ecclesiastical court, and the principle decided is limited to subjects clearly within its province, according to the regulations and rules from which the authority is derived.

Watson and others vs. Avery and others.

3.  While the principle is recognized as firmly and correctly established, that civil courts can not and ought not to rejudge the judgments of spiritual tribunals, as to matters within their jurisdiction, whether justly or unjustly decided, the argument is rejected that, whether the synod had jurisdiction and power over the subject on which it acted under the presbyterial system, *is a question purely ecclesiastical, to be settled by the synod itself and the general assembly.*

4.  The powers of the higher courts of the Presbyterian Church are not only defined and limited by the constitution of the church; but if it be true that the inferior courts and people of the church are bound to accept as final and conclusive the assembly's own construction of its powers, and submit to its edicts as obligatory, without inquiring whether they transcend the bounds of the constitution or not, the will of the assembly, and not the constitution, becomes the fundamental law of the church.

5.  The general assembly of the Presbyterian Church, like other courts, is limited in its authority by the law under which it acts; and when rights of property, which are secured by the organic law of the church, are violated by unconstitutional acts of the higher courts of the church, the parties aggrieved are entitled to relief in the civil courts, as in ordinary cases of injury resulting from the violation of a contract or the fundamental law of a voluntary association.

6.  The constitution of the Presbyterian Church defines and prescribes the powers and gradation of courts, in which the spiritual government of the church is vested, consisting of—1st. The session; 2d. The presbytery; 3d. The synod; and 4th. The general assembly. And it is not controverted that each of these bodies above the session has jurisdiction as an appellate or revisory court, to affirm or reverse the judgments of the one next below it; but both the synod, in ordering the election of additional ruling elders in the Walnut Street Church, in Louisville, and the general assembly in ratifying it, assumed to act in the exercise of original jurisdiction. And there is no provision in the constitution which authorizes either of these bodies to supersede or displace the church sessions and take upon themselves the immediate spiritual government of the congregations.

7.  The order of the synod directing the election of additional ruling elders in the Walnut Street Church was contrary to the constitution of the Presbyterian Church, and not obligatory upon the session and congregation of said church, and the persons claiming to have been so elected were not thereby constituted ruling elders; nor were they so constituted by the declaration of the general assembly.

THOS. W. BULLITT,                 For Appellants,

CITED—

*Tyler's Ecclesiastical Law, secs.* 104, 841.

7 *B. Mon.,* 481; *Gibson vs. Armstrong.*

6 *Wright,* 503; *Sutter vs. Trustees Dutch R. Church.*

18 *Vert,* 511; *Smith vs. Nelson.*

7 *Holsted; Den vs. Bolton.*

4 *Wheat.,* 603; *Commonwealth vs. Green.*

1 *Buchanan's Ten Years Conflict, p.* 427.

*Innis' Law of Creeds in Scotland.*

5 *Scotch Court of Session Rep., new series, p.* 665.

3 *B. Mon.,* 257; *Shannon vs. Frost.*

*Cunningham's Church History of Scotland, pp.* 480, 370, 439, 446.

*Hetherington's History of the Church of Scotland, pp.* 51–2 *and* 81–3.

*Treaty of Union, A. D.* 1707, *and Act of Parliament in Appendix to Hetherington's History.*

2 *Parsons on Contracts, chapter* 1.

*Kent's Commentaries, page* 448*.

*Westminster Form of Church Government.*

*Minutes of Synod at Henderson, and General Assembly at Saint Louis.*

*Baird's Assembly's Digest, pp.* 716, 301, 252.

*Form of Government, chap.* 13, *sec.* 2; *chap.* 9, *sec.* 6; *chap.* 8, *secs.* 1 *and* 2; *chap.* 10, *secs.* 8, 1; *chap.* 11, *sec.* 4.

*Appeal and Complaints, chap.* 4, *sec.* 16; *chap.* 6, *secs.* 1, 11, *and* 12; *chap.* 7, *secs.* 3 *and* 4.

*Book of Discipline, chap.* 4, *sec.* 23; *chap.* 6, *sec.* 12; *chap.* 7, *secs.* 1, 3, 4.

*Proceedings of General Assembly at St. Louis,* 11*th day.*

*Baird's Digest, "Assemblies," Second Presbytery.*

I. & J. CALDWELL,                   On same side,

Watson and others vs. Avery and others.

E. S. WORTHINGTON, HAMILTON POPE, and J.
    B. KINKEAD,                              For Appellees,
                    CITED—
    18 *Vt.*, 511 ; *Smith vs. Nelson.*
    3 *B. Mon.*, 253 ; *Shannon vs. Frost.*
    7 *How.*, 40 ; *Luther vs. Borden.*
    3 *How.*, 589 ; *Permoli vs. First Municipality.*
    *Acts of the Apostles*, 18 ; 14, 15, *and Barnes' Notes.*
    20 *Johns.*, 12 ; *Dieffendorf vs. Reformed Cal. Church.*
    9 *Barb.*, 134 ; *Robertson vs. Bullions.*
    1 *Edw. Chy.*, 592 ; *Bowden vs. McLeod.*
    *Penn. Presbyterian Church Case*, 591.
    4 *Wharton*, 503 ; *Commonwealth vs. Green.*
    41 *Penn.*, 14 ; *McGinnis vs. Watson.*
    *Brightly's Reps.*, 234 ; *Skilton vs. Webster.*
    3 *Barr*, 282 ; *German Reformed Church vs. Seibert.*
    4 *Zabr.*, 659 ; *Den vs. Pilling.*

JOHN M. HARLAN and E. S. WORTHINGTON,    On same side,
                    CITED—
    *Session Acts* 1853–4, *vol.* 2, *p.* 269.
    *Printed Minutes General Assembly* 1863, *p.* 43.
    7 *B. Mon.*, 653 ; *Kane, &c., vs. Pilcher.*
    7 *Alabama*, 484 ; *Dupuy vs. Roebuck.*
    9 *Alabama*, 803 ; *Stewart vs. Conner.*
    26 *Alabama*, 413 ; *Ewing vs. Peck.*
    27 *Miss.* (5 *Cush.*), 227.
    8 *B. Mon.* ; *Hadden vs. Chorn.*
    *Form of Government*, chap. 11, sec. 4, chap. 13, sec. 2.
    7 *Dana*, 195 ; *Curd, &c., vs. Wallace, &c.*
    *Book of Discipline*, chap. 1, sec. 1, chap. 7, secs. 1–22.
    7 *B. Mon.*, 481 ; *Gibson vs. Armstrong.*
    *Baird's Digest*, 144, 68, 152, 165–6, 233 *to* 246, 114–15,
        87, 66, 67.
    5 *B. Mon.*, 573 ; *Lewis vs. Harbin, &c.*

JUDGE HARDIN DELIVERED THE OPINION OF THE COURT:

This is an unusually interesting controversy, whether considered with reference to the rights of property to be affected by its determination, or the fact that it involves important questions concerning the constitution and government of the Presbyterian Church in the United States.

In stating such facts as are deemed necessary to show the grounds of our decision, we shall omit the recital of many others to which the parties have given prominence in the record; because, however they may have illustrated the merits of certain disputes between the parties in a tribunal having authority to consider them, they are not, in our opinion, material or relevant to any question which it is our province to decide, on this appeal.

On the 8th day of October, 1853, Edward P. Humphrey and wife conveyed a lot of ground on Walnut street, in the city of Louisville, to John Gault, James Malona, and George Gowan, as "Trustees of the Third Presbyterian Church of the city of Louisville," to be held by said trustees and "their successors to be chosen by the congregation." Upon this lot is situated the church edifice, the use and control of which constitute the subject of litigation in this cause.

A corporation was created for the benefit of said congregation in 1854, by an act of the Legislature, in pursuance of which B. F. Avery, George Fulton, and Henry Farley, were, at the institution of this suit, acting trustees of the temporalities of the congregation of said church.

In March, 1865, Rev. William T. McElroy, in the capacity of stated supply, was the acting pastor in charge of said congregation, and he and John Watson, Joseph Gault, Thomas J. Hackney, and John Martin, the ruling

elders of the church, constituted the session charged with maintaining the spiritual government of the congregation acccording to the form of government of the Presbyterian Church.

It appears that about that time certain efforts of part of the session and others to continue said McElroy's pastoral relations with the congregation, developed the existence of two antagonistic parties, nearly equally dividing the members on the question of retaining the services of Mr. McElroy; and out of their conflicting preferences on this subject grew the disturbances and strife which led to this litigation.

In the meantime, Martin ceased to act as a ruling elder, and subsequently removed from the State, leaving the session composed of McElroy, Watson, Gault, and Hackney; and in August, 1865, charges of unchristian conduct were preferred against Hackney, upon which it was resolved by the other members of the session to arraign and try him according to the discipline of the church. Charges were in like manner, also, preferred against Avery and McNaughton, prominent members of the congregation, and who opposed the continuance of Mr. McElroy's pastoral connection with the church.

McNaughton having unsuccessfully petitioned the presbytery to dissolve McElroy's relations with the church, presented his petition to the synod of Kentucky, praying that body to " appoint a commission to investigate the condition of said congregation in all its relations, and hear the complaints and testimony of all parties; or to take such other action in the premises as in the wisdom of synod shall be best calculated to prevent the destruction and promote the edification of the congregation."

Hackney and Avery also applied to synod, by separate petitions, protesting against the trial of their cases by the session, as composed of McElroy and others, and praying the appointment of a commission to adjudicate their cases "by enjoining the congregation. to convene for the election of new ruling elders not tainted with schism, or by any other mode as shall seem to them meet."

The action of the synod on these petitions will sufficiently appear from the following extracts from the published minutes of that body, the first being of date the 15th of October, 1865, and the other five days thereafter.

*October* 15.—" The judicial committee presented their report, No. 2, which was received, approved, and is as follows :

" The committee further report that the two remaining papers in their hands, to-wit: the one of T. J. Hackney, being a protest and complaint against the proceedings of the session of the Walnut Street Church against himself; and the other the protest and complaint of B. F. Avery against the same session, in its proceedings against himself, have been duly examined.

" In the judgment of your committee neither of these papers can properly come before synod in the form of complaint at the present time, inasmuch as both these cases are still pending in the lower court.

" The committee, however, for the relief of the parties aggrieved, recommend that synod allow them to place the papers in the hands of the special committee on the petition of Mr. McNaughton and others, inasmuch as the matters complained of are substantially of the nature of those named in the petition."

*October* 20.—" The next order of the day was taken up, viz : the report of the select committee on the

papers from the Walnut Street Church. The report of said committee is as follows:

"The special committee to whom was referred certain petitions and complaints from members of the Walnut Street Church, recommend that said papers be returned to those to whom they belong, as they appertain to matters now pending before the session of said church. And your committee would remind those who feel aggrieved, that when the case pending shall be issued, if they should feel that injustice has been done, they may appeal or complain to the higher courts in regular order.

"All the papers were read, viz: the petition of D. McNaughton, the petition of certain members of said church, the complaint of T. J. Hackney, the complaint of B. F. Avery, the petition of certain members of said church to the presbytery of Louisville, the records of said presbytery, two letters of D. McNaughton, a letter from the session of said church to W. T. McElroy. All the papers having been read, a substitute was offered for the report. After some discussion, the previous question was called for on the motion to adopt said substitute. The call for the previous question was sustained. The main question was put. The substitute was adopted, and is as follows:

"Synod having the papers in reference to the Walnut Street Church, orders that a committee, consisting of J. L. McKee, S. R. Wilson, J. C. Young, R. Knott, and William Garvin, be, and they are hereby, appointed to visit said congregation, with the power to call a congregational meeting for the purpose of electing additional ruling elders, calling a pastor or choosing a stated supply, and doing any other business competent to a congregational meeting that may appear to them, the said congregation, necessary for their best interests.

" To this committee are referred all the papers in the case, with directions to attend to the matter at as early a day as possible, and report their whole action to the synod at its next regular meeting.

" The session, when it shall have been constituted as above provided for, shall proceed, at as early a day as practicable, to adjudicate all the cases now pending in that congregation; until which time all further proceedings in the above cases are suspended."

Said committee of synod, or a majority of them, having, by a notice published in the secular newspapers, called a congregational meeting, to be held at said Third or Walnut Street Church on the evening of the 2d day of January, 1866, a portion of the members of the congregation assembled at the church door at the time appointed, but finding the gates and doors barred and locked, by order of the session, proceeded to organize their meeting on the sidewalk of the street, in front of the church building; after which, the meeting was adjourned to a school-house in the vicinity, where the following resolutions and proceedings were adopted:

"*Resolved*, That this meeting reiterate the statements and desires expressed in petition to the session on the 23d of August last, and in the representation to presbytery on the 30th of that month, and in the petition to the synod at its recent session in this city—all drawn up by D. McNaughton on behalf of a majority of the congregation; and that if discipline is to be applied to the writer of said document, we also desire to be disciplined, as we heartily indorse the contents.

"*Resolved*, That the congregation now proceed to the election of additional ruling elders, four in number, for the reason, in addition to others, given in said petition, that the present acting elders, Gault and Watson, have

arbitrarily opposed every effort made by the members to exercise their right and privilege to hold a congregational meeting.

"Nominations for the eldership were now made in accordance with the terms of the resolution. B. F. Avery, D. McNaughton, D. McPherson, and James A. Leech, were elected unanimously.

"On motion of D. McNaughton, it was resolved, that the committee of synod be requested to be present at the ordination and installation of the elders elected; that the chairman of the committee of synod be requested to officiate on that occasion; that at 7 P. M., on the 9th of January, 1866, at the Walnut Street Church, be the time and place; and that notice is now given to the congregation of the election of trustees to be there held.

"On motion of D. McPherson, the clerk was directed to order and instruct the trustees of the church to have the church edifice open for the admission of the congregation on Tuesday, the 9th of January, 1866, at 7 P. M."

On the evening of the 9th January, 1866, a meeting assembled at the church, but again found the doors closed, and were denied admission by the trustees, Fulton and Farley, acting under orders of Gault and Watson. A meeting being again organized on the sidewalk of the street, was thence adjourned to the German Lutheran Church on Grayson street, where the following proceedings were had:

"On motion, it was then resolved, that the ordination and installation of ruling elders, elected at the congregational meeting on the 2d instant, be now proceeded with. D. McNaughton, an ordained elder, was then installed, and B. F. Avery and J. A. Leech were ordained and installed, with services by Rev. J. L. McKee, and were

declared to be a part of the session of Walnut Street Presbyterian Church."

And the following preamble and resolutions were adopted:

"Whereas, George Fulton, one of the trustees of the church, has locked its doors upon the congregation; and whereas, Henry Farley, another of the trustees, has refused his consent to the opening of the doors:

"*Resolved*, That our session be requested to lose no time in ordering said trustees to have the church opened for our use (which order has already been given by the congregation), so that wherever the power lies, in the congregation or in the session, they may have no excuse for disobeying.

"*Resolved, further*, That in case said trustees, Fulton and Farley, still persist in withholding from the congregation the use of their building, a committee of three, consisting of Messrs. Avery, McNaughton, and McDougal, be appointed to take the necessary steps to obtain immediate and permanent possession of our church building, and to bring suit for damages in such sum as they may fix upon against Fulton and Farley, for wrongfully depriving us of our church property, and the details of said suit to be left to the discretion of the committee, and the expenses to be paid by the congregation."

Subsequently, on several occasions, it was proposed by Avery, McNaughton, and Leech, as ruling elders, to organize the session of the church in conjunction with Watson and Gault; but they were not recognized by said Watson and Gault as ruling elders, nor admitted into the church building for the purpose of holding the session; and being thus excluded and rejected, they made the following formal declaration on the 12th day of January, 1866:

" We, B. F. Avery, D. McNaughton, and Jas. A. Leech, members of Walnut Street Presbyterian Church, elected to the office of ruling elders by the congregation, and ordained and installed by the committee commissioned by the synod of Kentucky for that purpose, considering that Joseph Gault and John Watson refuse to recognize us as members of session, assuming and asserting that they, and they alone, are the present acting session; therefore, in the name and on behalf of the congregation by whom we are elected, and in the name and behalf of the synod by whose power and authority we are ordained and installed, and in the name and by authority of said session, we protest against said Gault and Watson's assumption, and against their refusal to recognize us as ruling elders. We protest that we will not recognize them but as a minority of the session who have been invited by a vote of the congregation to retire from active duty; nor will we recognize any of their acts as the acts of the session. We, as a majority of the present acting session, will proceed to adjudicate the business of this court and of the congregation, and adjourn to meet for that purpose on next Monday evening, at Elder Hackney's residence."

On the 1st day of February, 1866, said B. F. Avery, D. McNaughton, and B. L. McDougal, on behalf of themselves and about thirty-seven other members of said congregation, exhibited their petition in equity in the Louisville chancery court, against said John Watson, Joseph Gault, George Fulton, and Henry Farley, claiming that said Avery, McNaughton, and Leech had been duly elected and installed as ruling elders of said church, and as such, with said Hackney, composed a majority of the session, with authority to maintain the spiritual government and control of the church. They allege that

they, and those for whom they sue, constitute a large majority of the members of said church, who are entitled to its privileges; and that they, and those in whose behalf they sue, have been, and, unless prevented by the court, will continue to be, unjustly excluded from said building, when required for the transaction of official business; and that therein said Fulton and Farley have grossly violated their duty as corporators and trustees. They pray that, by order of the court, the church building may be opened for congregational and session meetings, as the congregation and session may require, and that Fulton and Farley be removed from office.

The general assembly of the Presbyterian Church in the United States convened in the city of St. Louis on the 17th of May, 1866, having referred to the committee on bills and overtures a "petition and memorial" of said B. F. Avery, D. McNaughton, J. A. Leech, and T. J. Hackney, as ruling elders in the Walnut Street Church in Louisville, praying for "such redress as in the wisdom of the general assembly might seem just and necessary to redress the grievances of said church, as set forth in said memorial and petition," on the 30th of May, 1866, adopted a report made by said committee, which, though not specially pleaded by the plaintiffs in the action, was, on the 2d day of June, 1866, filed by them, to be read as evidence in the cause. It is as follows:

" Whereas, on the 2d day of January last, D. McNaughton, Benjamin F. Avery, and James A. Leech, were duly elected ruling elders by the congregation of said church, and, on the 9th day of January, the said D. McNaughton was installed, and Benjamin F. Avery and James A. Leech were duly ordained and installed ruling elders in said church; and whereas, the presbytery of Louisville, after the election of said elders, with the apparent design

of discrediting said election, denied to one of their number a seat in said presbytery, notwithstanding he had been duly elected to represent said church at a meeting of said presbytery; and whereas, it is evident that the peace of said church and their congregational rights are in great danger, unless this Assembly shall interpose its authority; therefore, this general assembly, by virtue of its authority and obligation to give advice and instruction in all cases submitted to them, does hereby declare that the said D. McNaughton, Benjamin F. Avery, and James A. Leech, are to be recognized and acknowledged as ruling elders in said church, and all church courts, and persons subject to, or under the care of, this assembly, are solemnly enjoined to respect and sustain their authority as such."

It is proper here to state, that at the presbytery of Louisville, which met in April, 1866, Mr. Watson appeared as a delegate to represent the Walnut Street Church, by appointment of the old session, composed of Mr. McElroy, Mr. Gault, and himself; and Mr. Avery also appeared as a delegate to represent the same church, by appointment of the session, supposing himself, McNaughton, Leech, and Hackney, to be acting members of it. A committee appointed to examine and report of their respective claims to be received as delegates, made a report which reviewed at length and in very emphatic language repudiated the action of the synod of 1865, in appointing its committee to visit the Walnut Street Church, as well as the action of the meeting by which Avery and others claim to have been elected as ruling elders; and recognizing the appointment of Watson, rejected that of Avery as the delegate of said church; but before final action was had on said report, the presbytery adjourned to meet again in June, 1866, when the report was adopted, but not until

after a part of the ministers and elders who at first com-
posed the presbytery had withdrawn and organized them-
selves as a separate body, claiming to be the presbytery of
Louisville, in connection with the general assembly, and
which, as such, accepted Avery as a delegate.

The adoption of said report to the presbytery of Louis-
ville was afterwards concurred in, and approved by the
body which assembled and acted as the synod of Ken-
tucky, at the city of Henderson, in October, 1866.

The defendants by their answers contested the validity
of the election of Avery, McNaughton, and Leech as
ruling elders, on several grounds, the consideration of
which will, to some extent, involve an examination and
construction of what is known as the constitution of the
Presbyterian Church in the United States.

The chancellor, upon final hearing, adjudged and de-
creed that Avery, McNaughton, and Leech, together with
Hackney, Watson, and Gault, were ruling elders, consti-
tuting the session of said church; and that the manage-
ment of the property of said church, for the purposes of
worship and other religious service, was committed to
their care under the regulations of the Presbyterian
Church in the United States; and this judgment is be-
fore this court for revision on this appeal

As suggested in the argument, and apparently conceded
on both sides, this is not a case of division or schism in a
church; nor is there any question as to which of two
bodies should be recognized as the Third or Walnut
Street Presbyterian Church.   Neither is there any con-
troversy as to the authority of Watson and Gault to act
as ruling elders; but the sole inquiry, to which we are
restricted, as we conceive, is, whether Avery, McNaugh-
ton, and Leech are also ruling elders, and therefore
members, of the session of the church.

But before considering this question, according to any standard of decision in a judicatory of the Presbyterian Church, it becomes necessarry to determine, as a preliminary question, whether, inasmuch as the congregational meeting by which Avery and others claim to have been elected was called in pursuance of an order of synod, and its action was subsequently approved by the general assembly, it is within the province of a civil court to inquire into the validity of such election, even so far as to determine whether the authority claimed under it is or not absolutely void.

It is insisted for the appellees, that when the action of an ecclesiastical tribunal is drawn in question, the only question for a secular court is, is the matter decided of purely ecclesiastical cognizance? and that if it is so, the secular court must accept the judgment rendered as final and conclusive, without inquiry as to the grounds or reasons for the decision, and even if it is wrong.

This is certainly true, in a qualified sense. It was said by the supreme court of New York, in the case of *Robertson vs. Bullions*, 9 *Barbour*, 134, that "all the authorities agree that the civil courts cannot upon the merits overhaul the decisions of ecclesiastical judicatories in matters properly within their province." To the same effect is the decision of the supreme court of Pennsylvania in the case of the *German Reformed Church vs. Seibert*, 3 *Barr*, 291, and also the opinion of this court in *Shannon et al. vs. Frost et al.*, 3 *B. Monroe*, 258, in which it is held that "this court having no ecclesiastical power, cannot revise or question ordinary acts of church discipline or excision." The same principle is recognized in several other cases. But in none of those cases is it held, so far as we are aware, that where an ecclesiastical body or tribunal had transcended the scope of its authority, and attempted to

adjudicate a matter as to which it had no jurisdiction, such adjudication was nevertheless conclusive in a civil court. But in most of the decisions referred to an express or implied reference is made to the jurisdiction of the ecclesiastical court, and the principle decided is limited to subjects clearly within its province, according to the regulations or rules from which its authority is derived.

And in *Smith vs. Nelson* (18 *Vermont*, 566) the action of the associate synod, in dissolving the presbytery of Vermont, setting its members over to the jurisdiction of the Cambridge presbytery, suspending the ministers, and finally deposing them by the presbytery of Cambridge, is elaborately reviewed, and decided to be void for want of authority, and from the irregularity of the proceedings.

While we recognize the principle as firmly and correctly established, that civil courts cannot, and ought not, to rejudge the judgments of spiritual tribunals, as to matters within their jurisdiction, whether justly or unjustly decided, we cannot accept as correct the principle contended for in the argument for the appellees, that whether the synod had jurisdiction and power over the subject on which it acted under the presbyterial system, is a question purely ecclesiastical, to be settled by the synod itself and the general assembly. Such a construction of the powers of church tribunals would, in our opinion, subject all individual and property rights, confided or dedicated to the use of religious organizations, to the arbitrary will of those who may constitute their judicatories and representative bodies, without regard to any of the regulations or constitutional restraints by which, according to the principles and objects of such organizations, it was intended that said individual and property rights should be protected.

Especially is this so with reference to the powers of the higher courts of the Presbyterian Church. Those powers are not only defined, but limited by the constitution. But if it be true, as insisted for the appellees, that the inferior courts and people of the church are bound to accept as final and conclusive the assembly's own construction of its powers, and submit to its edicts as obligatory, without inquiring whether they transcend the barriers of the constitution or not, the will of the assembly, and not the constitution, becomes the fundamental law of the church.

But the constitution having been adopted as the supreme law of the church, must be supreme alike over the assembly and people. If it is not, and only binding on the latter, the supreme judicatory is at once a government of despotic and unlimited powers.

But we hold that the assembly, like other courts, is limited in its authority by the law under which it acts; and when rights of property, which are secured to congregations and individuals by the organic law of the church, are violated by unconstitutional acts of the higher courts, the parties thus aggrieved are entitled to relief in the civil courts, as in ordinary cases of injury resulting from the violation of a contract, or the fundamental law of a voluntary association.

If those having control of church property and privileges in a Catholic or Episcopal organization in this country, should attempt to transfer them to the use of another sect or denomination, in violation of the fundamental principles of such organization, and to the destruction of the very objects for which their authority was conferred; or even if a majority of the members of a Baptist or other congregational church should determine to sell and appropriate to individual use their

church edifice, erected by means of individual donations, or the contributions of its members, as a house of worship, can it be said that a civil court may not interpose to give relief or protection against acts so flagrantly void, for want of jurisdiction or authority for their commission?

It has, we think, been unnecessary that this court should be reminded by the distinguished counsel for the appellees, that, " if the action of church courts, upon matters purely religious, is to be revised by the civil tribunals," the country should know that such is the course to be pursued in this State. We are conscious of no purpose to depart from precedent, or to disregard authority on this subject; and we adhere to the principle recognized by this court in *Gibson et al. vs. Armstrong, &c.*, 7 *B. Monroe*, 481, that, in deference to the rights of church tribunals, a civil judge should " lend a reluctant ear to a claim founded on the alleged invalidity, in view of the law of the church, of an act done in the accustomed manner by the accustomed organ of authority." And, as suggested by the counsel, if there have been irregularities in the action of church courts, it were better " to let them settle their quarrels in the bosom of their churches than drag them before the civil tribunals." But while it is true that the appellants have, in defense of the suit, assailed the action of the Synod and General Assembly as invalid, it cannot escape observation that it was the appellees who invoked the aid of the civil court in this case, and sought to question the action and conduct of those ruling elders who, in opposition to them, assumed to continue to control the use of the church, as they had been accustomed to do, as the recognized session of the church.

The question being then raised, and by the plaintiffs themselves, whether the session of the church consisted,

as formerly, of the acting pastor, and Watson, Gault, and Hackney; or of them and Avery, McNaughton, and Leech, in addition, and the control of the church property being involved in this question, we must decide it as we do all other civil controversies brought to this court.

It seems to us, without elaborating this particular inquiry further, that if it be true, as insisted for the appellants, that the election of Avery, McNaughton, and Leech, was void for want of constitutional authority in the synod to direct it, or the assembly to ratify it, or for any other cause, it was within the power and was the duty of the chancellor to so decide; and to determine that question, it now becomes necessary to inquire into the validity of the proceedings under which, the appellees insist, that Avery, McNaughton, and Leech are duly elected elders of the Walnut Street Church.

In the progress of the cause in the court *below*, the parties filed the following agreement:

" It is hereby agreed, that, upon the trial of the above cause, the following described printed documents may be produced in evidence by either party, and used in the same manner and with the same effect as if the original documents, of which they purport to be copies, had been produced before competent witnesses, under a regular commission upon interrogatories, and regularly proven by them, viz:

" 1. Baird's Digest of the Acts of the Assembly. 2. The Constitution of the Presbyterian Church in the United States of America, containing the Confession of Faith, the Catechism, and Directory for the Worship of God, together with the plan of government and discipline, as ratified by the General Assembly at their session in May, 1821, and amended in 1833. 3. The minutes of the Gen-

eral Assembly of the Presbyterian Church in the United States of America, for the years 1861–2–3–4–5–6, respectively. 4. The minutes of the Synod of Kentucky, met in Louisville, October, 1865, and again at Henderson, October, 1866. 5. The Declaration and Testimony.

"The sole object of this agreement is to admit that the said printed documents are correct copies from the originals, which original documents were adopted by the bodies and in the manner and form as declared and set forth in said printed documents.

"All objections to the relevancy of said documents, or any part of them, by either party, or to their production or use as evidence, upon any grounds other than a deficiency of proof as to their adoption by the bodies purporting to have adopted them, or the correctness of the printed copies, are reserved to either party, &c."

We have set out the foregoing agreement for the purpose of showing how the printed documents therein mentioned became connected with the record.

In reviewing the judgment of the chancellor in this case, upon a question which, in one aspect or another, involves the jurisdiction of the several judicatories of the Presbyterian Church, we feel that our duty as a civil court is rendered peculiarly difficult and embarrassing by the ecclesiastical nature of the subject.

We have set forth in our statement of the facts of this case the action of the synod, and proceedings under which Avery, McNaughton, and Leech, claim to have been elected as ruling elders in pursuance thereof, and the subsequent action of the general assembly in confirmation of their election. It remains to determine, from the constitution of the church, and the explanatory evidence in the cause, whether the election of said parties as elders was or not void, either for want of jurisdiction

in the synod to order it, or for want of jurisdiction in the general assembly to declare it valid, if otherwise invalid; or for irregularity in the calling or action of the congregational meetings of the 2d and 9th of January, 1866.

The Presbyterian Church in the United States, unlike the mother church in Scotland, has not at any time been connected with the civil government; and in this, and some other particulars, it differed from the mother church in the principles and arrangement of its government, before the adoption of its constitution in 1788. At that time the synod of New York and Philadelphia was the highest tribunal in the church. It adopted the constitution, and by it the general assembly was created and established as the highest judicatory of the church.

The constitution defines and prescribes the powers of a gradation of courts or bodies, in which the spiritual government of the church is vested, consisting of—

1st. The session, composed of the pastor or pastors and ruling elders of a particular congregation.

2d. A presbytery, consisting of all the ministers and one ruling elder from each congregation within a certain district.

3d. A synod, composed in like manner as a presbytery of ministers and elders within a larger district, including at least three presbyteries.

4th. The general assembly, consisting of delegations from the various presbyteries.

It is not controverted that each of these bodies above the session may, in the exercise of an appellate or revisory jurisdiction, review and affirm or reverse the judgments of the one next below it, and that, by a series of appeals, the decisions of a session may ultimately be carried before the general assembly. But it

VOL. II—23

is insisted for the appellants that the action of both the synod and the general assembly, concerning the election of additional elders in the Walnut Street Church, was an unauthorized assumption of an original jurisdiction, primarily to be exercised by the session alone, subject to the visitorial power of the presbytery. While, on the other side, it is contended, in accordance with the opinion of the chancellor, that besides the admitted revisory powers of the synod and assembly, they respectively possess a primary and original jurisdiction, commensurate and concurrent with that of each inferior judicatory, and that the action of each of those bodies, in relation to the Walnut Street Church, was within the scope of its jurisdiction, and therefore valid.

It becomes necessary, in considering these conflicting theories, to set out and examine certain provisions of the constitution, in the construction of which the parties mainly differ.

The 6th section of chapter 9, of the form of government, is as follows:

"The church session is charged with maintaining the spiritual government of the congregation; for which purpose they have power to inquire into the knowledge and Christian conduct of the members of the church; to call before them offenders and witnesses, being members of their own congregation, and to introduce other witnesses, when it may be necessary to bring the process to issue, and when they can be procured to attend; and to receive members into the church; to admonish, to rebuke, to suspend, or exclude from the sacraments those who are found to deserve censure; to concert the best measures for promoting the spiritual interests of the congregation, and to appoint delegates to the higher judicatories of the church."

Under the general supervision of the affairs of the congregation thus conferred on the session, it is claimed that the question of ordering the election of additional elders was one to be determined by it as the primary judicatory of the Walnut Street Church.

The 8th section of chapter 10, of the same book, provides:

"The presbytery has power to receive and issue appeals from church sessions, and references brought before them in an orderly manner; to examine and license candidates for the holy ministry; to ordain, install, remove, and judge ministers; to examine and approve or censure the records of church sessions; to resolve questions of doctrine or discipline, seriously and reasonably proposed; to condemn erroneous opinions, which injure the purity or peace of the church; to visit particular churches for the purpose of inquiring into their state, and redressing the evils that may have arisen in them; to unite or divide congregations, at the request of the people; or to form or receive new congregations, and in general to order whatever pertains to the spiritual welfare of the churches under their care."

And section 4, of chapter 11, declares, that—

"The synod has power to receive and issue all appeals regularly brought up from the presbyteries; to decide on all references made to them; to review the records of presbyteries, and approve or censure them; to redress whatever has been done by presbyteries contrary to order; to take effectual care that presbyteries observe the constitution of the church; to erect new presbyteries, and unite or divide those that were before erected; generally to take such order with respect to the presbyteries, sessions, and people under their care, as may be in conformity with the word of God and the

established rules, and which tend to promote the edification of the church; and finally to propose to the general assembly for their adoption such measures as may be of common advantage to the whole church."

Such powers of the general assembly as are deemed essential to this inquiry are conferred by the 4th and 5th sections of the 12th chapter of the form of government, and are as follows:

"IV. The general assembly shall receive and issue all appeals and references which may be regularly brought before them from the inferior judicatories. They shall review the records of every synod and approve or censure them; they shall give their advice and instruction in all cases submitted to them in conformity with the constitution of the church; and they shall constitute a bond of union, peace, correspondence, and mutual confidence among all our churches.

"V. To the general assembly also belongs the power of deciding in all controversies respecting doctrine and discipline; of reproving wrong or bearing testimony against error in doctrine, or immorality in practice in any church, presbytery, or synod; of erecting new synods when it may be judged necessary; of superintending the concerns of the whole church; of corresponding with foreign churches, on such terms as may be agreed upon by the assembly and the corresponding body; of suppressing schismatical controversies and disputations, and in general of recommending and attempting reformation of manners, and the promotion of charity, truth, and holiness, through all the churches under their care."

. Our quotations of the provisions of the constitution, concerning the jurisdiction of the session and of presbytery, have not been made for the purpose of determining any question as to the primary duties enjoined upon

them by the constitution, but for the purpose of showing more distinctly the relations which the several judicatories of the church bear to each other, as affecting the question of original and concurrent jurisdiction in the synod and general assembly.

It cannot be pretended that either the synod or assembly, in its action in regard to the Walnut Street Church, assumed to exercise its authority as an appellate court. The session of the church had in fact rendered no decision to be revised in any superior judicatory. Therefore the validity of the order of synod, as well as of the declaration of the assembly, must depend solely and exclusively upon the correctness of the principle affirmed by the chancellor, that notwithstanding the primary jurisdiction of the subject vested in the inferior tribunals, and the right of parties aggrieved to appeal from their decisions, these higher courts also possessed original jurisdiction of the subject.

As to the power of the synod, it will readily appear, upon examining the section of the constitution conferring its .authority, that if it possessed original jurisdiction at all to order the election in Walnut Street Church, it is granted in these words: " generally to take such order with respect to the presbyteries, sessions, and people under their care, as may be in conformity to the word of God and the established rules, and which tend to promote the edification of the church." This apparently general direction is immediately preceded by the grant of many specific powers, so defined as to indicate a purpose to declare specially those which it was intended the court should exercise.

But if the words, " *to take such order as may be in conformity with the established rules*," mean anything, they have reference to the other provisions of the constitution,

Watson and others vs. Avery and others.

and among them those conferring the jurisdiction and prescribing the duties of the inferior courts, and operate to restrict the action of the synod to a general exercise of its own powers, without encroaching on those of the other courts; and this is our interpretation of the clause, as that which seems to us most consonant with the spirit of the constitution and the established rules of construction.

Liable as we think the action of the synod is to the objection that it is contrary to the constitution, the declaration of the general assembly is not less so.

Keeping the fact in view that both of said bodies acted as courts of original jurisdiction, and not in the exercise of their appellate or merely corrective authority, it is worthy of consideration, that while the constitution, in the book of discipline, provides in plain and explicit language that "every kind of decision which is formed in any church judicatory except the highest, is subject to the review of a superior judicatory;" and the several modes of bringing such decisions before the higher courts are clearly prescribed, and nothing concerning them is left to vague construction, there is no express provision anywhere in the constitution authorizing either of those bodies to supersede or displace the church sessions, and take upon themselves the immediate spiritual government of the congregations.

The chancellor seems to have based his decision mainly on the declaration of the general assembly, whose jurisdiction he holds to be "original as well as appellate;" and he illustrates the difficulty of locating the original jurisdiction claimed, on any particular provision of the constitution, by intimating the opinion that the assembly, in assuming to act "by virtue of its authority and obligation to give advice and instruction in all cases submitted to them," *did not state the true grounds of jurisdiction.*

Upon a careful examination of the provisions of the constitution conferring and defining the jurisdiction of the assemby, it does not seem to us that, either on the grounds recited in its declaration or any of those enumerated by the chancellor in his opinion, it is clothed with the original jurisdiction claimed for it on behalf of the appellees.

If it be true that the election of Avery, McNaughton, and Leech was invalid for want of power in the synod to order it, or for any other reason, and those gentlemen were not therefore ruling elders at the time the assembly put forth its anomalous declaration, had the assembly the power by that declaration to bring them into official existence—elected, ordained, and installed ruling elders in the Walnut Street Church? And if this extraordinary power existed, what was the character of the act of exercising it? Was it an appointment or an election?

The constitution makes no provision for the *appointment* of ruling elders; but in the 2d section of the 13th chapter of the form of government, it expressly declares, that " every congregation shall *elect* persons to the office of ruling elders."

Shall it be said, however, that although the assembly could not substitute itself for the congregation of the Walnut Street Church, and elect for it additional ruling elders according to the requirements of the constitution, it yet had power, by a declaration of ratification, to impart vitality and validity to proceedings which were otherwise unconstitutional and void? But however absurd the idea of attempting to affirm a void judgment, or give constitutional sanction to an unconstitutional proceeding, to have done so would have required an exercise of appellate, and not of original jurisdiction; and it is not claimed, and cannot be, that

the assembly acted in any such capacity. No appeal had been prosecuted; nor was any decision of session, presbytery, or synod before the assembly for revision, in any of the modes prescribed by the constitution.

It is true, it is insisted that both the synod and assembly derived jurisdiction of the subject, as on *complaint* by the petitions of McNaughton and others; but as the constitution expressly defines "a complaint" to be a representation "respecting a decision by an inferior judicatory, which, in the opinion of the complainants, has been irregularly or unjustly made," and as there was no decision or judgment to be reviewed, upon complaint or otherwise, the argument imports no more than the assertion of original jurisdiction.

For obvious practical reasons, it seems to us to be inconsistent with the very objects of the system of judicatories in the Presbyterian Church, that its highest tribunal should have primary cognizance of the local affairs of particular congregations. Could it have been contemplated by those who formed the constitution that this high court, representing the different presbyteries of the United States, concerned, as it must be, during its brief annual sessions, with matters of vast importance to the whole church, could, as a court of original authority, hear and decide the various controversies and questions of conduct and discipline, which might arise in the congregations of the church! How could it do so? It has no power, by civil process, to coerce the attendance of witnesses; and they could not be expected to travel hundreds of miles to testify in such matters, even if the assembly was not disqualified by its numbers and more important duties to transact such business.

There is nothing in the analogy, which is supposed to exist between the government of the church and the

Federal and State governments, to sustain the latitudinous construction of the powers of assembly, under the constitution, contended for on the part of the appellees.

In the civil system, as in the Presbyterian Church, there is a gradation of inferior and superior courts; but generally the jurisdiction of the higher courts is not original, but revisory and corrective only.

Although the practice of the assembly itself, with reference to its constitutional powers, seems not to have been uniform, or such as to be entitled to controlling influence in this case, it does not seem to accord with the chancellor's opinion that those powers " are as general as can be expressed." On the contrary, it has been affirmed by the assembly that " the constitution of the Presbyterian Church, like that of our National Union, is a constitution of specific powers, granted by the presbyteries, the fountains of power, to the synods and the general assembly;" and that " no powers not specifically granted can lawfully be inferred and assumed by the general assembly, but only such as are indispensably necessary to carry into effect those which are specifically granted." (*Baird's Digest,* 722.)

The testimony of several witnesses examined in this cause with reference to the action of both the synod and assembly, should not be overlooked. Those witnesses are Rev. George Junkin, of Pennsylvania, Rev. H. J. Vandyke, of New York, and Rev. Stuart Robinson and Rev. S. R. Wilson, of Kentucky, whose depositions, taken by the defendants, show them qualified by experience and study to testify to a knowledge of the laws and usages of the Presbyterian Church.

Their testimony (which was admitted without objection in the court below) was, we think, at least competent to prove the usage of the church, and the

meaning accepted by it of the terms and language of its laws, and, if necessary, to prove the laws of the church themselves. (1 *Greenleaf*, *sec.* 295, *and note* 1; 8 *B. Monroe*, 307.)

According to their explanations of the laws and usages of the church, the action of both the synod and the general assembly, in regard to the election of additional ruling elders in the Walnut Street Church, was unconstitutional and void.

Another grave objection is taken to the election of Avery and McNaughton as elders. It is insisted for the appellants, that, in consequence of the pending charges against them, they were not constitutionally eligible to the office of ruling elder.

In section 2 of chapter 13 of the form of government, providing for the election of elders and deacons, it is declared, that "in all cases the persons elected must be male members in full communion in the church in which they are to exercise their office."

According to the testimony of Dr. Junkin and others, a church member who has been cited, and so put under process of trial for any improper conduct, is not a member in *full communion*.

But however this may be, and whether certain other objections to the regularity of the proceedings of the meetings of the 2d and 9th of January, 1866, are properly taken or not, we are of the opinion that the said order of the synod, directing said election of additional ruling elders in said church, was contrary to the constitution of the Presbyterian Church, and not obligatory upon the session and congregation of said Walnut Street Church; and said Avery, McNaughton, and Leech, not having been elected as ruling elders according to the laws and regulations of the church, were not thereby

constituted ruling elders, nor were they so constituted by said declaration of the general assembly.

And the judgment of the chancellor, which commits the management and control of said church property to said Avery, McNaughton, and Leech, in conjunction with said Watson, Gault, and Hackney, is therefore deemed erroneous.

Wherefore, the judgment is reversed, and the cause remanded for proper corrective proceedings respecting the possession, control, and use of the church property, and for final judgment in conformity to this opinion.

JUDGE WILLIAMS DISSENTING FROM THE OPINION OF THE MAJORITY OF THE COURT, DELIVERED THE FOLLOWING OPINION:

As said by appellants' attorneys in their brief, this case involves "*no question concerning the identity of separate bodies, each claiming to be the true succession of the body known as the Third or Walnut Street Presbyterian Church, nor any question of ultimate title to the church property.* Neither is there a question of apportionment according to numbers under our statute."

But there is a question of the validity of the election, as elders by said church, of B. F. Avery, D. McNaughton, and James A. Leech, and their right to sit in the session of said church, which session has the control and direction of the church edifice.

Unfortunate disturbances having arisen in said church, elder Thomas J. Hackney and deacon B. F. Avery were put under charge, specification, and process, by the then sitting session; they objected to being tried by this ecclesiastical court as then constituted, but their objections were overruled, and, before the day for their trial was fixed, the presbytery met at Louisville, August 30th, 1865.

McNaughton made a representation to this presbytery accompanied with the petition of thirty-five names, claiming to be members of said Walnut Street Church, praying that it should not sanction the employment of Rev. W. T. McElroy as the stated supply to said church, which the session had entered into against their desires. Said petition had previously been presented to the session of the church, and subsequently, and before presented to the presbytery, four other members indorsed it, and these claimed to be a majority of the congregation.

The committee to whom these papers were committed reported that they deemed them "*unsuitable to come before the presbytery, inasmuch as it relates to matters now pending before the session*," which was adopted. At the session of the synod held at Louisville, October 13th, 1865, McNaughton, by a paper styled by him a petition, presented to it the fact that a petition signed by thirty-five members had been presented to the church session August 23d, praying for a dissolution of the relation of stated supply with Rev. Mr. McElroy at the expiration of his then current engagement in October, 1865, and that the session having refused to act thereon, he had represented it to the presbytery, which had deemed it unsuitable to come before them ; that he had subsequently notified it of complaint against this decision and assigned the cause; but that, believing the time of synod would be taken up with more important matters, he had determined to present, instead thereof, his memorial of facts, and refers to an accompanying petition, signed, as he says, by forty-one members of said congregation, asking redress and praying for the appointment of a commission to investigate the condition of the congregation, hear the complaints and testimony of all parties, and to take such other action as in the wisdom of the synod

it shall deem best to prevent the destruction and promote the edification of the congregation.

Hackney and Avery both presented papers setting forth their grievances, which they style "complaint and appeal," and wind up by asking a commission to adjudicate their case and to convene a meeting of the congregation to elect new elders. These two papers seem to have been referred to the judiciary committee, but were afterwards, on its motion, transferred to the special committee in possession of McNaughton's papers. The committee made an adverse report, but the, synod adopted as a substitute for it a resolution appointing Rev. J. L. McKee, S. K. Wilson, J. C. Young, R. Knott, and W. Garvin, as a committee to visit the said congregation, with power to call a congregational meeting for the purpose of electing additional ruling elders, calling a pastor, or choosing a stated supply, and doing such other business as a congregation may be competent to, and with a direction that "*the session, when it shall have been constituted as above provided for, shall proceed, at as early a day as practicable, to adjudicate all the cases now pending in that congregation.*"

Pursuant to a notice by this committee, a portion of the members of said congregation, claiming to be a majority, did afterward elect as elders Avery, McNaughton, and James A. Leech, who were ordained and installed; also McPherson, who was neither ordained nor installed. These, together with Elder Hackney, proposed a joint session with Elders Watson and Gault, who had been acting as the old session, but who refused to recognize these as constituting any part of the session, or being at all office-bearers of said church, save Elder Hackney, who had been suspended, during his trial, from the privilege of acting as such. These

four, claiming to be a majority of the church session, ordered the trustees and session to open the church house for worship at stated times, designated the minister to officiate, which they refused to do; hence this suit was brought to compel the opening of said house for worship, under the direction of said session, constituted in part of these elders, and to open it to all the congregation. During the pendency of this litigation, and before a final decree, the general assembly of the Presbyterian Church of the United States met at St. Louis, and, on May 30, 1866, declared that McNaughton, Avery, and Leech are to be recognized and acknowledged as ruling elders in said church, and all church courts and pastors subject to, or under the care of, this assembly, are solemnly enjoined to respect and maintain their authority as such.

It is contended by one party in the church that these proceedings by the synod to elect elders, and the recognition of their being duly elected and qualified by the general assembly, are contrary to the constitution and form of government of the Presbyterian Church, and therefore null and void; while the other side contend that the action of both the synod and the general assembly are authorized by the fundamental laws of the church, and are valid.

The theories of these respective parties have been maintained by the ablest divines of the church, and with marked and signal ability.

The one theory is, that the higher church courts can only deal with cases that come up regularly from the lower courts by appeal, complaint, reference, or review of their records, &c.; that it is a government of fixed laws, and that the general assembly has only delegated authority; that to each tribunal is allotted its power

and jurisdiction, and it can only interfere with the proceedings of inferior jurisdictions in one of the modes pointed out; and some liken it to the Constitution of the United States.

The other theory claims, that neither the assembly nor any of the inferior church courts derive their powers from the constitution, churches, presbyteries, or synods, but assert that all church power is of the Lord Jesus Christ; and every church court, existing by divine authority, derives its power from Him, and not from the constitution or any church court; and they argue that the language of the constitution teaches this, not by way of granting, but of declaring, the power in each, as that "the church session *have* power," not that *it shall have* power. " Presbytery *has* power;" " The synod *has* power;" " To the general assembly also *belongs the power;*" not that these shall have power. It is argued, therefore, that the church constitution *restricts* the exercise of power *inherent* in every church judicatory, whilst the Constitution of the United States contains only grants of power by the people to the national government, hence that they are totally unlike. This theory asserts that the session has jurisdiction over a single church or congregation; that presbytery has an extended jurisdiction over a number of churches, and concurrent original jurisdiction with such session over its immediate church; that synod has a still more extended jurisdiction over a number of presbyteries, and concurrent original jurisdiction with the presbytery and each session over each individual church; that the general assembly is the aggregate of all the individual church presbyteries and synods, and has jurisdiction over all the synods, and concurrent original jurisdiction with each synod, presbytery, and session, down to each individual church.

And to establish this, they invoke the history, powers, precedents, and teachings of the mother church of Scotland, and many precedents and teachings in the history of the American Presbyterian Church.

And they also found it upon chapter 12, "Form of Government," section 1: "*The general assembly shall represent in one body all the particular churches of this denomination.*"

" Sec. 4. The general assembly shall receive and issue all appeals and references which may be brought before them from the inferior jurisdictions. They shall review the record of every synod, and approve or censure them.

" Sec. 5. To the general assembly *also belongs the power of deciding in all controversies respecting doctrine and discipline, of reproving, of warning, or bearing testimony against error in doctrine, immorality in practice, in any church, presbytery, or synod, * * * * of suppressing schismatical contentions and disputations, and in general of recommending and attempting reformation of manners, and the promotion of charity, truth, and holiness throughout all the churches under their care.*"

It is contended that the fourth section declares appellate jurisdiction in the general assembly, and the power to review the action of inferior judicatories, and that said fifth section fully declares original jurisdiction commensurate with the whole church and with each individual church, and their respective wants and necessities. The question whether these elders were elected strictly according to the constitution, discipline, and customs of the Presbyterian Church, is therefore one of strictly nice ecclesiastical law, and one upon which the ablest divines and judges of their ecclesiastical courts have differed; and starting, as they do, from different stand-points and premises, have sustained their respective sides with

cogent arguments, fortified by imposing historical facts and church authority, scattered along the pathway of more than two centuries. The churches of the United States, unlike those of most other nations, are mere voluntary associations, with self-imposed governments, rules, and restrictions; all have their own voluntarily selected church tribunals and judicatories, and, like the civil governments of the American States, each has an ultimate final tribunal, from which no appeal can be prosecuted, because there is no higher power to appeal to; and, like the civil tribunals, these final courts must expound and determine their own jurisdiction as a part of the laws of their church; and, when so determined, on simply and purely ecclesiastical questions, the civil courts must take their expounding as final, conclusive, and binding.

By the fundamental rules and discipline of the Presbyterian Church the qualifications, eligibility, and manner of appointment of licensures, pastors, bishops, and commissioners, are as well defined as those of elders. If a civil tribunal can adjudicate as to the regularity of the appointment of an elder, it is not perceived why it may not do so as to any other of the above named office-bearers, and thus in one way and another all their appointments would constantly be subject to the review of the civil tribunal which may have neither the inclination nor opportunity of investigating the church law, nor indeed may be educated in it.

If, as contended by appellants, the proceedings of the inferior judicatories are binding until reversed by a superior one, and, therefore, the judgment of the presbytery deciding that it had no jurisdiction, because the matter was still pending before the session, was final until re-

versed, why is not the subsequent proceeding of the synod appointing the committee to call a congregational meeting to elect elders also binding until reversed? And which, instead of being censured and reversed or repealed by the general assembly, has been approved and confirmed by it.

There is an essential difference in the very foundation announcement between this church government and our civil institutions. In the former, the powers of government are not partitioned among three separate bodies of magistrates as in the latter; in the first the executive, legislative, and judicial functions are all vested in the same tribunal, whilst in the last, these are confided to three separate bodies, with an injunction that the powers of the one should not be exercised by the others, either jointly or separately.

As said in chapter 7, section 1, of the Presbyterian Discipline, " in all governments conducted by men wrong may be done from ignorance, from prejudice, from malice, or from other causes; *and to prevent this wrong is one great design of superior judicatories, and that there must be a last resort, beyond which there is no appeal.*" Any other doctrine is destructive of all law, order, and government, either in church or State.

It may be said that the supreme court of a State or church may err and may do unconstitutional things; but what other tribunal can undo these things? Can an inferior judicatory, either in State or church, decide that the supreme judicatory has transcended its bounds and usurped a jurisdiction? Who is to determine the jurisdiction of a supreme and final court but its own body?

In *Gorham vs. Lucket* (6 *B. Mon.*, 146), this court reversed the order of the Franklin county court removing Gorham as jailer and appointing Lucket to the office,

and directed the county court to set aside the orders of dismissal and appointment.

The county court insisted that their acts in removing and appointing the jailer were not judicial, but executive, and that, therefore, this court had no jurisdiction of the case, and that they were not bound by its decision, and should not obey its orders.

On motion in this court a summons was issued against the county court justices to show why they had not carried into effect the mandate of this court; and on trial, same book, 641, it said:

"It is the beauty of our system of government that all classes are subject to the authority of the laws, *as expounded by the court of last resort*, as well those who are clothed with the judicial ermine or the robe of executive power, as the humblest citizen—all owe obedience *to its mandates*, and due obedience may be enforced against all."

It also said: "Who is to determine whether it had or had not jurisdiction, this court or the county court? *If the latter, then the order of things should be reversed*, and appeals hereafter taken from this court to the county court."

Again it said: "*This court, as well as all others, must decide upon its own jurisdiction over cases brought before it*, as well as upon the merits of the controversy, *and its decision upon one or the other is final and conclusive* (except when appeals may be taken to the supreme court of the United States). In deciding upon either, it may, and doubtless does, often err, as no human tribunal is exempt from error."

But the judges must decide according to the dictates of their judgment and conscience. These remarks in their moral scope are generally applicable to ecclesiastical tribunals.

This church was represented in the synod that appointed the committee by one of the old session, and he there entered his objections, and the synod determined to appoint a committee. He notified an appeal, but it was not prosecuted in the general assembly; therefore the synod's decision was not reversed, but remains in full force. The parties had an opportunity to be represented in the general assembly. The jurisdiction of the general assembly to declare as to these elders was considered and discussed, and a decision rendered.

And in *Ableman vs. Booth, and United States vs. Booth* (21 *How.*, 516), will be found a case in which the supreme court of Wisconsin decided a statute of the United States unconstitutional, and also decided the supreme court of the United States had no jurisdiction to review or reverse their decision; yet the supreme court of the United States took jurisdiction and reversed the judgment of the Wisconsin supreme court; and in alluding to this extraordinary decision, it said: "It has not only reversed and annulled the judgment of the district court of the United States, but it has reversed and annulled the provisions of the Constitution itself, and the act of Congress of 1789, *and made the superior and appellate tribunal the inferior and subordinate one.*"

Whether the case was regularly or irregularly before the synod, *it was there*, and the synod determined its jurisdiction, whether as appellate or original it determined its action, and no inferior tribunal could annul it if the principle of inferior and superior jurisdiction is to be regarded; and so, too, of the general assembly.

Comprehensive original jurisdiction is claimed for synods under the last member of section 4, chapter 11, Form of Government, which is as follows:

" The synod has power * * * generally to take such order with respect to the presbyteries, sessions, and people under their care, as may be in conformity with the *Word of God* and the established rules, and which tend to promote the edification of the church." This is clearly an original jurisdiction, for the appellate jurisdiction had been provided for in the antecedent part of the section, and under it the synod has any original jurisdiction which is in conformity with either the *Word of God or the established* rules of the Presbyterian Church; and before we could declare its action null, we should survey the whole range of the vast field of the Divine Word, as well as the rules of the church.

It is conceded that the synod had appellate jurisdiction over every action of the presbytery as it had over the sessions, and that the general assembly has the same jurisdiction over the synod. Thus the jurisdiction of both the synod and general assembly are conceded; but it is insisted that this jurisdiction can only be exercised upon proceedings by appeal.

This statement of the case at once presents to the mind that, at last, this is not so much a question of jurisdiction and constitutional power in these two bodies, as it is a question of the regularity of their proceedings; and we as a civil court are asked to review and pronounce these proceedings irregular and null, as though we were educated in the rules, laws, and proceedings of the church, and to set up our judgment as to the conformity of these proceedings to the customs and laws of the church in contrast and in opposition to these bodies, constituted as they were of the very ablest men and ministers of the church who had devoted their lives and labor to a study of the church cause, its rules of faith and government.

A secular court cannot review the regularity or irregularity of an ecclesiastical court, in matters strictly spiritual, as in the election and ordination of elders or any other office-bearers.

And on a question of jurisdiction upon such proceedings, like the civil courts, they must be permitted to adjudicate for themselves, subject alone to the revisory powers of their own superior judicatories, and finally their supreme court and legislative assembly must, for itself and all its inferior courts, like a supreme civil court, determine its own jurisdiction, as well as the regularity of the proceedings.

The old and new court controversy, so memorable in the history of Kentucky, is also illustrative of this principle.

In that controversy the Legislature, having attempted to repeal and remodel the appellate court, the court determined that it was a constitutional court, beyond the repealing and remodeling powers of the Legislature, decided the enactment unconstitutional and nugatory, and thereby preserved its own existence, which has been not only acquiesced in, but universally approved as sound constitutional law; and though some of the inferior courts of the State regarded its decision as unconstitutional and void, it still maintained its supremacy.

These civil decisions are illustrative of the great principle that the decision of the courts, not only as to matters in controversy, but as to their own jurisdiction, must be regarded and are binding until reviewed by a superior tribunal; and then, when the final and highest tribunal is reached, however erroneous its decision, it is binding upon the parties, for there must be an ultimate tribunal in every government, else inter-

minable, perpetual litigation and strife must ensue. If presbyteries can review and pronounce the decision of synods and assemblies null, their decisions in turn can be carried to those higher courts and there reversed, which the presbyteries in turn could pronounce unconstitutional and void, and then again be reversed by the same courts, and thus no ultimate adjudication would be arrived at. This would be, of course, destructive of all government. It is believed, also, that appellate and original jurisdiction in the same tribunal has many illustrations in our civil polity. There is a class of cases which may be brought and adjudicated in the State courts, but which may be removed to the circuit court of the United States before adjudicated in the circuit court of the State; and if so removed, it stands as an original case in the United States court, but parties may await the adjudication of the State court, and then take it by appeal to the same United States court. By second paragraph of section 2, article 3, United States Constitution, original jurisdiction is given to the supreme court of the United States over certain matters and appellate over others. Original and appellate might have been given over all enumerated subjects, had it been deemed wise to do so.

In 2 *Duvall*, 352, *in ex parte O. S. Tenney*, this court held that a practicing attorney by going into the rebellion, and having returned and taken the amnesty oath prescribed by the President of the United States, did not by reason thereof cease to be an attorney, nor forfeit the right to practice his profession. The circuit court had previously refused to admit him because of disqualification. Now, had he gone to another State where our attorneys are allowed to practice, and offered to do so, and the question had been raised against him, should the courts of

such State determine his right by the judgment of *the circuit* or the appellate court? On the simple isolated question whether he was a qualified practitioner in Kentucky, can there be any doubt but that the decision of this court should prevail over that of the circuit court? yet the latter was not reversed. And can there be any doubt that Mr. Tenney could have brought up the decision of the circuit court for revision? Had Mr. Tenney been met with the argument that the decision against him in the circuit court was still unreversed and unappealed from, and that this court had only appellate and not original jurisdiction, he would have replied that the appellate and highest court of my State has decided that it had original jurisdiction, and that I was not disqualified from the practice of my profession. Which argument should the court of a sister State have yielded to? For certainly none will contend that it would go into an examination to see whether this court had or had not original jurisdiction. And was not the decision of this court as authoritative as if it had been made upon an appeal from the circuit court's judgment against him?

Or should an appeal be taken from quarterly courts to, and adjudicated by, this court, should any of the inferior or intermediate courts be allowed to disregard its decision because they might deem this court without jurisdiction, because the appeal was not presented first to the circuit or common pleas court.

As this is purely an ecclesiastical appointment, however irregular or unjust, it is beyond the power of secular courts to relieve against it; for, as said by this court in *Shannon et al. vs. Frost et al.*, 3 *B. Monroe*, 261, " Self-doomed to the uncontrolled will of a majority of a church selected by themselves, they cannot obtain redress in this forum;" so these parties, self-doomed to the unlimited

and omnipotent powers of their ecclesiastical courts, they can obtain no redress here. If it be said the written constitution of this church makes a contract between its members, one of the stipulations of that contract is, that this church has a final tribunal *from which there is no appeal*, but that its decision is to be regarded as conclusive, and still they are not relieved from this correct and sound principle, that by their voluntary consent they have submitted all ecclesiastical questions to this forum, and that the civil tribunals carrying out this self-imposed obligation, will take as conclusive the decisions of the church courts on all such questions.

I have not alluded to the subsequent proceedings of the newly-organized synod at Henderson, after its disruption, simply because it was a schismatical body.

The following are referred to as illustrative and sanctioning authorities for these views :

In *Shannon vs. Frost*, 3 *B. M.*, this court adjudicated upon a case where a majority of the Baptist Church had expelled a minority *without charges* and *without trial*, and *which also involved their property rights* in and to the use of the church edifice, and on an appeal by this minority to the civil courts to protect them in their property rights, this court said :

" *Whether right or wrong, the act of excommunication must, as to the fact of membership, be law to this court.*"

The case of *Gibson vs. Armstrong*, 7 *B. Mon.*, 481, was one growing out of the disruption of the Methodist Church in 1844; the plaintiff sought to get the church property, based upon the unconstitutional division of the church; the defendants relied upon the division for their protection to it.

This court said: " *It is for the authorities of the church, in the first instance, to judge of an infraction of its laws, and*

to determine whether the ecclesiastical jurisdiction belonging to any particular body or functionary of the association had been forfeited by such infraction.     *     * The party setting up a claim on the ground of such alleged invalidity, should at least plant itself upon some opposing act or judgment of some recognized organ or body in the church having the authority to act or to judge in the premises."

Again it said:

"There would seem to be due from the tribunals of the civil government to those of the church at least so much respect as to require that the acts done by the latter, in the name of the church, should be deemed valid under its law, and that the defendant's right should be determined accordingly, until those rights were reviewed by the church, or at least until they were conclusively demonstrated to be against its law.     *     *.     *     *     *     *     * If the question of power were doubtful, we should be bound to regard the act of the church, and therefore as effectual."

And in *Deu vs. Bolton* (2 *Green's C. R.*, 322) the court said:

"*It belonged to the proper judicatories of the church to decide who are the spiritual officers of any particular congregation subject to their dominion;* that the statute having vested the office of trustees in such spiritual officers, without any further designation, *the court was bound to respect their decision;* and that to determine the question who were legally such trustees, it had only to ascertain who had been constituted such officers, *by the governing power of the church,* according to its own rules."

And this was approved by the supreme court of New Jersey, in the *American Primitive Society vs. Pellings et al.* (4 *Zabriskie*, 659). In the *German Reform Churches vs.*

*Seibert* (3 *Barr*, 291) the supreme court of Pennsylvania said :

" The decisions of ecclesiastical tribunals, like every other judicial tribunal, are final, as they are the judges of what constituted an offense against the word of God and the discipline of the church; any other than those courts must be incompetent judges of matters of faith, discipline, and doctrine ; *and civil courts, if they should be so unwise as to attempt to supervise their judgment on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt, which would do anything but improve religion and good morals.*"

Nothing is perceived in this case to authorize a departure from these wise and conservative principles, which at once secures and preserves the freedom of religious liberty and independence of the church courts, in all purely spiritual matters, from the control of temporal courts or the baneful influence of partisan contest. Nor can the laws governing the rights of Baptist and Methodist be different from that regulating all other churches.

It is believed that not a single case referred to by the majority in anywise involves the legality of an ecclesiastical appointment by the regular church. In *Sutter vs. The Trustees of the Dutch Reform Church* (6 *Wright*, 503), referred to by appellants' counsel, a majority of the congregation had voted to call as their paster a minister of another entirely different church; this call the classis of the church would not sanction, but rejected it, as was their right, and directed the consistory to proceed to call a pastor ; whereupon a large number of dissenters from the decision called a meeting for the purpose of dissolving their connection with the church, and, by subsequent proceeding, actually became schismatics. The court said: "We have said nothing about the reason why the classis

refused to admit a strange minister into their denomination as the minister, *because is is everywhere admitted that their reasons, so far as they are theological, are not to be reviewed by us.*"

*Commonwealth vs. Green* (4 *Whar.*, 599) was a case where, on the convocation of the general assembly of the Presbyterian Church, the moderator of the preceding assembly presiding temporarily, according to custom and their constitution, for the purpose of organization, and whilst in process of organization, by his instrumentality, a provisional moderator was suddenly chosen by a minority of those entitled to vote, including the exscinded commissioners. The question on the motion to elect was put by the mover, not by the presiding moderator, after which the seceding ·party elected a permanent moderator and withdrew. The assembly then declared, as to them, that they "be, and are hereby declared to be, out of the ecclesiastical connection of the Presbyterian Church of the United States; and that they are not, in form or fact, an integral part of said church."

By an act of the Pennsylvania Legislature, a corporation had been created by the designation of the Trustees of the General Assembly, by virtue of which the general assembly of the Presbyterian Church had a right to elect certain trustees in the corporation. These· seceders having organized a general assembly, elected a trustee, and caused a *quo warranto·* to be issued to try the title to the office against the trustee appointed by the old general assembly. This being the issue, we can understand what the court decided, and some extracts will place the whole matter properly before the legal mind.

The court said :

" Could the synods, however, be dissolved by a legislative act? I know not how they could have been

legitimately dissolved by any other. *The assembly is a homogeneous body, uniting in itself without separation of parts the legislative, executive, and judicial functions of government;* and its acts are referable to the one or the other of them, according to the capacity in which it sat when they were performed."

Again: " But what matters it whether the facts were actually what the assembly supposed they would be? *If that body proceeded in good faith, the validity of enactments cannot depend on the justness of its conclusions. We have, as already remarked, no authority to rejudge its judgments on their merits; * * * * this was predicated of judicial jurisdiction, but the principle is necessarily as applicable to jurisdiction for legislative purposes.*"

It is, therefore, very clear the court referred said resolution to the legislative function of the assembly. As presbyteries, synods, and the general assembly all have legislative as well as judicial power, and as the fundamental rules of the church do not designate how congregational meetings to elect elders are to be called, the appointment of this committee by the synod was clearly within its legislative jurisdiction, and as a legislative act, I know of no power in a temporal court to declare it null, and a decision that it could not be done in the exercise of judicial functions does not meet the case, nor show that the power was unconstitutionally exercised.

And the approval and affirmance of the election of these elders, by the general assembly, can as easily be referred to its legislative as judicial power, and be regarded in the light of a legalizing enactment, so common in our civil government. If these actings come within either the legislative, executive, or judicial functions of these bodies, by what authority, and how, can this court fix the particular function exercised, and then declare it did not authorize the act done?

It is all sufficient if it comes within either; and if it pertains to spiritual matters and appointment of officers in the church, its action is binding and conclusive on civil courts. Appeal indeed presupposes adjudication, and because the sessions had not adjudicated seems to be the reason why the presbytery thought the matter improperly brought before it. But were it a case pending before a civil court, in which the judge being implicated, he would not either grant the prayer of the petitioners nor desist from adjudication, and whilst in this condition the accused should appeal to the Legislature to give them another tribunal or change of venue or some other remedy, and it should constitute other judges to try the cause, would any one suppose this would be the exercise of appellate judicial jurisdiction, and therefore void? Much less should it be so where the same tribunal has appellate and original judicial and legislative power combined.

The case of *Smith vs. Nelson* (18 *Vermont*, 511) has been referred to by appellants and the court, yet I presume the majority does not mean to regard it as authoritative, unless they are prepared to abandon all that this court has heretofore decided. They cannot, as will be seen from the following extracts :

" In England the ecclesiastical law and courts are established legitimate authority, and become a part of the law of the land.　　*　　*　　*　　*　　*　　*　　*

" In this State the case is wholly different. We have no religious establishment, no ecclesiastical law or courts established by authority.

"All their laws are wanting in this essential requisite to give them authority, that they are not *prescribed by the supreme power in a State*. And though they may form constitutions, enact canons, laws, or ordinances, estab-

lish courts, or make any decisions, decrees, or judgments, yet they can have only a voluntary obedience, cannot effect any civil rights, immunities, or contracts, or alter or dissolve any relations or obligations arising from contract. When their proceedings are to be examined by ordinary tribunals of justice, their *power is a phantom, and they can receive no other consideration than the regulations of any other voluntary association, formed for trifling or grave and important purposes.*

"Obedience to the requisitions of any ecclesiastical societies may be required, under the penalty of spiritual censures; *but this is the only penalty incurred by disobedience;* and whether one submits to or defies the proceedings of an ecclesiastical court, or any censures passed by them, depends on his conviction of the regularity or irregularity of their proceedings. In short, they can only affect the conscience of the individual; how far they affect this, he must be the judge. * * * * In a court of justice, sworn to administer justice according to *law, I cannot recognize any constitution, laws, ordinances, or sentences of any ecclesiastical tribunal, or of any voluntary society, as having any efficacy or power over the civil rights, immunities, or contracts of individuals.*"

Thus putting the constitution, laws, usages, courts, and tribunals of a great body of Christians, with their learned divines and doctors of divinity, elders, pastors, bishops, and professors, and presbyteries and synods and general assembly, with millions of dollars' worth of church property, all upon a par with the voluntary association of an insignificant base-ball club; and, on these premises, proceeded to disregard the action of presbytery and synod in excommunicating certain ministers.

But in this case all this was done to uphold the popular rights and wishes of a congregation, whilst in this State

it is quoted as authority in derogation of the popular rights of the congregation.

But I heartily approve of some of the utterances of the court in the case relative to the free and impartial character which should attend all courts, as follows:

To any and every court there must be *actor reus and judex.* If the judge become *actor or reus*, it is plain there can be no impartial or regular judgment. In every trial for an offense, however trivial, the person accused is entitled to an impartial trial, by unbiased judges, who have no hostility or prejudice against him, and whose judgment is unfettered by previous conceived opinions.    *    *    *    *    *    *I have no hesitation in saying that these proceedings, by which the minority transferred themselves into a majority, consisting of the persons against whose sitting in that case there were such strong and unanswerable objections, vitiate and render void the proceedings of the presbytery of Cambridge in relation to Dr. Bullions.*" In *Day vs. Savage, Hob.*, 87, Lord Chief Justice Hobart declared an act of Parliament made against natural *equity as to make a man a judge in his own case void*—because this would disrobe the court of all dignity, render the introduction of evidence a farce, make its judgment a solemn mockery, and its punishment an arbitrary injustice.

These remarks apply, in all their length and breadth, to the session court as constituted with elders Watson and Gault, and moderated by Mr. McElroy. There is, however, a striking inconsistency in this Vermont decision, in repudiating the English and Scottish authorities in relation to the excommunicated congregation, but adopting these as to the excommunicated ministers, because there the civil courts claimed and exercised the jurisdiction to restore an excommunicated minister,

but not as to a congregation. But I repudiate the whole of this decision as unsustained by American authority, in conflict with our own courts, and subversive of religious liberty, subjecting all the decisions of the spiritual courts and actings of their tribunals to review by the civil courts, and putting all their ecclesiastical rights at the disposal of the civil tribunals. Partaking, as it does, of the transcendentalism of that extremely radical and puritanical people, I regard it as an unreliable and dangerous authority.

But this Vermont case was expressly repudiated by the supreme court of New York, in *Robertson vs. Bullions* (9 *Barr*, *S. C. R.*, 78), in which the very same matters came under review, and the appellee being the same Dr. Bullions; and after so doing, at page 134, after reviewing all the authorities through a labored opinion, the court said: "I do not see how we can look beyond the decision of the synod. *All the authorities agree that the civil courts cannot, upon the merits, overhaul the decisions of ecclesiastical judicatories in matters properly within their province.* Dr. Bullions himself took the case to the synod, *and the deposition of a minister is purely an ecclesiastical matter, though the effect of that deposition upon civil rights is quite another thing.*"

So in this case the appointment of elders was purely an ecclesiastical matter, but the effect of their appointment on civil rights, when the title to the church property shall come to be tried, may be quite another thing.

In all these cases no question as to the appointment of church officers by the old and regular organization was raised or reviewed; and if there be such a case within all the range of American judicature, it has not been referred to nor found.

But in some of them the question of deposing officers and ministers did come under review; and the Vermont case has the distinguished honor of being alone in a disregard of the action and determination of the spiritual tribunals.

The appointment of trustees in a civil corporation, which in some instances have been involved, is a very different thing from the appointment to a purely ecclesiastical office, as that of elder; in the one it must be done according to the act of incorporation, and of this the civil courts must judge; in the other, it must be done under the church law, and of this the spiritual courts must judge.

If it were permitted to secular courts to review the decisions and legislative acts of ecclesiastical bodies, there would be much of error and seeming injustice found in these proceedings.

Although the unfortunate difficulties of this congregation may have been previously germinating, yet the first tangible data is to be found in the church meeting of March 22d, 1865, which had been called by the appellants as a session to elect a pastor, and in which they had recommended the election of Rev. W. T. McElroy, but at which meeting the church refused, by an equal vote, to call him as their pastor, several not voting either way, though he had been acting as stated supply of this church for several years. Notwithstanding which action of the church members, the session, four days thereafter, determined to renew his employment as stated supply, and, contrary to the laws and usages of the church, renewed it for a year, when it can only do so by the consent of the presbytery from one of its meetings to another, which is every six months; thus both the session and minister violating the laws of the church, and this in

utter disregard of both the rights and feelings of a large portion of the congregation, if, indeed, not a majority.

The presbytery at its next meeting approved of this employment until its following meeting.

On the second Sabbath after the church had refused to call him as their pastor, Mr. McElroy delivered a sermon in a spirit of harsh censure of that portion of his congregation adverse, for their conduct toward him, which gave great dissatisfaction and caused a large number to absent themselves from the church at the future appointed times of worship.

July 25th, 1865, D. McNaughton addressed to the session a letter recounting the untoward circumstances by which the church seemed surrounded, and suggested that a full meeting be called, and their sentiments ascertained, otherwise he would consider himself justified in withholding any other payments on his subscription.

To this the session, August 2d, 1865, made a not very conciliatory reply, and declined to call a meeting of the congregation.

Some twenty days thereafter some thirty-five members, including two deacons, petitioned the session, asking that it would not renew the engagement with Mr. McElroy as their stated supply, after the expiration of the current six months; but should it determine otherwise, then that the delegate of the session to the presbytery be instructed to make known their objections to it.

Four other members joined in this petition, August 29th.

The thirty-five original petitioners, however, claim to, then, be a majority of the surviving and acting members of this congregation.

And in the following October, forty-one members petitioned the synod, asking that a congregational meeting

be ordered by it to elect additional elders.   After taking
from the list of members furnished by the defendants
and Mr. McElroy in his deposition those who had re-
moved, such as had ceased to attend and co-operate for
years, those then dead, and those who had joined other
churches, a clear majority of the congregation were with
the appellees.

McNaughton replied to the session's response some
three days after its date.

The session took the initiatory steps which resulted in
charges and specifications at its own instance against B.
F. Avery, August 2d, and which was formally adopted
by it twenty-two days thereafter; and at the same meet-
ing of the session it preferred charges and specifications
against ruling Elder Hackney, all growing out of and
connected with these same matters.

September 13th, 1865, the session, on motion of Elder
Watson, *suspended Elder Hackney from the privilege of de-
liberating or voting as a member of their body, in any case,
until the final determination of his trial, whilst at the same
time it failed to notice or in any manner to act upon charges
preferred by two deacons of the church against Elder Watson.*
It also set Elder Hackney's trial ten days later than Mr.
Avery's, as though determined to try him before Elder
Hackney could be relieved, even by a judgment of ac-
quittal, so as to sit upon his case.   Both Avery and
Hackney objected to being tried by this court, as then
constituted, with Elders Watson and Gault, and Mr.
McElroy as clerk and moderator, by two written pro-
tests, the first of which was tabled and the other ruled
out of order.   In these protests various reasons are as-
signed, prominently among which were the personal con-
nection which these two elders and Mr. McElroy had
had with the causes of difficulty from its inception, and

because they were virtually trying the legality and purity of their own conduct; and being so connected and personally interested that in the very nature of things they could not make an impartial, unbiased tribunal, and because they had, in various specified ways, and on several occasions, manifested a great want of impartial, unbiased action.

It is most apparent that these church difficulties sprang out of the dissatisfaction of a majority of the congregation with the ministrations of Mr. McElroy, and with the action of the session in declaring him a stated supply in utter disregard of their wishes, and a persistent refusal to call a congregational meeting, or in any other mode to consult with the church members aggregately, and the entire refusal to attempt to procure the ministrations of any other preacher by the session.

There were, therefore, many potent and prudential reasons why neither Elders Watson nor Gault should have persisted in sitting as a church court to adjudicate the conduct of others so intimately connected with their own, and why Mr. McElroy should not have persisted in sitting as moderator, virtually in his own case, especially as section 3, chapter 9, Form of Government, authorizes a session to call some other minister than their own pastor, when from any cause it is improper for him to moderate their session.

The persistent presiding of Mr. McElroy, and the continued adjudication of Elders Watson and Gault, in matters so seriously affecting their own conduct, notwithstanding the protestations of those under charges, manifests such an indelicacy, if not partiality and prejudice, as to impress the candid, impartial mind, that they were not possessed with that elevated, candid, impartial, free, and just sentiment and condition of mind and feel-

ing so essential to the pure and impartial administration
of law, either sacred or secular, and which should ever
characterize courts, whether civil or ecclesiastical; and
this impression is not in the least relieved from the
circumstance of postponing Elder Hackney's trial sub-
sequent to that of Avery's, nor in debarring him from
sitting on Avery's trial, whilst they fail to put Elder
Watson under· process, or to debar him from the same
privileges, notwithstanding he was then under charges
preferred by two deacons, nor in anywise to notice these
charges.

Even-handed, exalted justice, the essence of Deity
himself, meets out to every one the same measure under
like circumstances; therefore, if it was proper to deprive
Elder Hackney of the right to adjudicate, because he
was under charges, this deprivation should have been
extended to Elder Watson for the same reasons.

By section 2, chapter 9, Form of Government of the
Church, it is provided, "that *two elders*, if there be as
many in the congregation, with the pastor, shall be *nec-
essary* to constitute a quorum;" and as there were four
elders, one not then acting, another under charges, may
have been the reason why Watson was not put under
process, nor the charges against him noticed, as Elder·
Gault would have alone remained, and could not consti-
tute a quorum; but this only still manifests the prede-
termination and prejudging of those under charges, and
rather strengthens than weakens the unfavorable impres-
sion of the other matters.

It is quite apparent that a suffering majority of the
church, instead of being relieved from their troubles
and burdens by their church session, was most despoti-
cally ignored, and their rights and feelings disregarded
by two elders, who, by their own conduct and manage-

ment, became possessed with the entire ecclesiastical authority of the session court. The congregation sought a redress of its grievances and the vindication of its rights in no revolutionary manner, but by a respectful appeal to the instinctive justice and powers of the church tribunal. A more extraordinary case, strongly demanding the interposition, in some manner, of some church authority, inspired by a love of even-handed justice, has rarely happened, and never within our observation.

The preacher could not be sustained without salary; the session could look only to the members to contribute this, and, whilst they thus despotically substituted their own preferences of a minister, unacceptable, if not odious, to a very large portion, if not to a majority, of the congregation, why should they look to those members for contribution, or why complain if they refused?

In the United States the laity of a church are not the vassals of its officers; and when an unacceptable and odious minister is foisted upon them, they are under neither a moral nor legal obligation to support him nor to hear him.

The civil laws of this and all our sister States, so far as is known to us, provide for the relief of those charged from being tried, from being adjudged, by either interested or prejudiced or partial tribunals; nor do these await the tardy and expensive and harassing process of appeal, but relieve them at once from the adjudications of such a court.

Whilst the Presbyterian discipline fully recognizes the *interest*, *partiality*, *prejudice*, and *wrong*, which all men may do whilst sitting as courts, yet it seems to have left with a sense of justice, propriety, and delicacy, the desisting from adjudication when those under charges

shall object to those trying them, else to relieve by an exercise of original jurisdiction in the superior tribunals.

That those so situated must be entitled to relief without the delay, harassment, expense of being adjudged by such a tribunal; that they may get relief by appeal, will at once strike the moral sense and love of justice of all men everywhere, within or without the church. And, as said by appellants' witness, Rev. S. R. Wilson, " the practice of the church has allowed, in extraordinary cases, the passing over of the presbytery, and taking an appeal or complaint directly to the synod against a church session."

If they could in extraordinary cases exercise this power, why not in extraordinary cases appoint a committee to call a congregational meeting of the members for the purpose of electing additional elders? Especially where both the constitution and discipline of the church is silent as to how and by whom such meetings are to be called; and more especially when a despotic session which has monopolized the powers of the court, refuses the congregation any relief, thus presenting the dernier alternative of continual suffering or relief by some superior power.

The parties charged must be tried by a session court; but those constituting the session were involved in the matter, and upon the plainest principles of natural justice and common honesty disqualified from sitting in the case.

The presbytery had failed to take jurisdiction, either appellate or original, or legislative, or in any manner to grant relief. Could a more extraordinary case for the interposition of synod in some manner be imagined?

After the synod had appointed the committee, with power to call a meeting of the church to elect additional elders, Messrs. Avery, Crowel, Browning, Ashcroft, Mc-

Naughton, Hackney, and Leech, proposed to compromise the difficulty by the session calling a church meeting to elect additional elders, and offering to pay their portion of McElroy's salary for the current as for the past six months; but with the provision that no effort should be made for his re-engagement, *but by the consent of the congregation.* This paper is dated November, 1865.

This met with no response from the session; had the session been conscious of the approval of the majority of the congregation, or had they supposed Mr. McElroy was an acceptable minister to it, or had they been conscious of the delicacy of their own conduct and the justice of their own position, here was an ample opportunity for triumphant vindication. Its non-acceptance affords food for reflection.

Instead of accepting the proposition of November, 1865, the session of December 2d put McNaughton under charges growing out of these same difficulties. Pursuant to a call of the committee on January 2d, 1866, some thirty-five persons, claiming to then be a majority of the acting members of the church, met in front of the church edifice, and finding the house closed, organized a meeting, adjourned to a neighboring house, and proceeded to elect as ruling elders B. F. Avery, D. McNaughton, D. McPherson, and James A. Leech. This meeting adjourned to meet January 9th, to ordain and install the elders.

McNaughton, who had before been ordained an elder, was at this adjourned meeting installed. Avery and Leech were ordained and installed. McPherson seems not to have been either ordained or installed. It is insisted, that as Avery and McNaughton were under charges by the old session, that they were not eligible, as section 2, chapter 13, Form of Government, provides that " in all cases the persons elected must be male members *in full*

*communion*," and this may be so; but neither McPherson nor Leech was under disabilities, so that the latter's ordination and installation, together with Gault of the old session, would have afforded a court not under charges; and had his election been recognized, there would have been a court to try elders Hackney, Watson, Avery, and McNaughton, or had it been desired that Elder Watson should sit, waiving all questions of delicacy, common justice required that Elder Hackney should have been relieved from the disabling resolution of the session, passed at Watson's instance. Thus, like most violent church, partisan difficulties, both parties have erred and both violated the rules of their church; but the elders, being invested with judicial functions, and having the care and oversight of the congregation, have more responsibility, and are held more rigidly accountable than ordinary members. And it is to be deeply regretted, not only on account of the disastrous consequences to this individual church, but for the cause of Christianity in general, that in an unguarded hour and way, that these ruling elders should have permitted themselves to become implicated in conduct so reprehensible, so indefensible, and so antagonistic to that Christian forbearance and exalted justice and inexhaustive charity, taught by the Master they profess to serve.

By the polity of the Presbyterian Church, the session has the spiritual oversight and care of the congregation. The ruling elders constitute the session; these are elected by the congregation when called for that purpose. It has been the custom of the session to call such meeting at the instance of the congregation.

But can it be that in this free country, within all its broad domains, there is a laity under such hopeless, doomed spiritual vassalage, as to have no relief from an

unjust and despotic session, save through the agency of
the very nightmare which broods over their destiny? Is
it possible that the Presbyterian polity has set up an
oligarchy as potential and irresponsible as that of the
Mohammedan or Pagan? Is it possible that in all the
broad range of superior tribunals, with their almost un-
limited jurisdiction, there is no power, judicial or legis-
lative, to relieve a congregation from the incubus of such
a session!

And must a laity remain under this doomed and hope-
less vassalage until a sense of justice and delicacy shall
pervade the session and give them relief? If all this be
true, then indeed is the omnipotence of this, the most
inferior tribunal of the church, so far as their immediate
congregation is concerned, equal to the spiritual head of
the Catholic Church, without its learning, dignity, and
responsibility, and superior to either presbytery, synod, or
general assembly. What other means of relief to a suf-
fering congregation so situated than the appointment of
additional ruling elders, and when the session persistently
declines to call a meeting, and the presbytery declines to
act because the session has not acted, what more appro-
priate remedy than the apppointment of a committee by
a superior tribunal, headed by a divine of distinction and
standing in the church, to call a congregational meeting
for such purposes?

And when a session, through a long course of con-
duct, and by a series of acts, worked the spiritual
destruction of a congregation, through persistent dis-
regard of the desires and wants of a majority of its
members, they assail the action of the spiritual power
that relieves the congregation as violative of the church
rules, and asks a civil tribunal to so determine. Should
the civil court indulge them, save from the clearest and

most indisputable rules of the civil law, they are bound to do so. And if done, it must be in utter disregard of the action and adjudication of the highest tribunals of the church, and a monstrous injustice and flagrant disregard of popular rights become sanctified in a civil court.

These times are too fraught with rampant, radical, revolutionary ideas to open a door so fraught with danger to all the southern churches and their church property. When the civil courts of their States may soon receive their appointment from, and be imbued with this rampant radicalism now prevailing in their newly enfranchised political powers, and when these soon to be newly-created courts take cognizance of the ecclesiastical proceedings of the different church tribunals, and pronounce them all unconstitutional, and by a monstrous injustice strip them of their property, they may quote the opinion of the Kentucky court to sustain the monstrous iniquity, not in its genuine and true spirit, but in the important controlling fact that it has recognized the power of a civil court over the heads of the church courts to expound the church constitution. This omnipotent power in the State courts will endanger every church owned by the Methodists previous to their division in 1844, for nearly every church deed was then in the name of the " *Methodist Episcopal Church*," and was not provided for in the plan of division of the bishops, nor settled in the decision of the supreme court of the United States in (16 *Howard*, 298). *Smith vs. Swormstead*, but only the book concern.

These courts may take cognizance of the questions growing out of the church property now possessed by the Presbyterians, and under the control of their southern general assembly. And, indeed, if the civil courts

can determine the constitutional appointment of elders, and declare such null because in conflict with the fundamental law of the church, it is not perceived why they may not review any other action of the church or its tribunals, and pronounce these also in conflict with it, and null, especially when they involve property. But however disastrous such results may be, if it be law, all should submit to it.

I do not, however, regard it as law, and can but regret that my brethren do. I am satisfied that no exigencies of this case call for the establishment of a precedent so full of danger and disaster to the great interests of the churches of the Southern States. The decision now under review really adjudicates no property rights, but only that one portion of the ruling elders have no right to exclude another portion from consultation and official action, and that the trustees of the church must be governed in opening it for worsnip according to the direction of the session, or a majority of its members, as constituted of all these elders. Believing, as I most earnestly do, that this is a purely unmixed, naked, ecclesiastical question, coming exclusively within the jurisdiction of the spiritual tribunals, and that their action should be received by all civil courts as binding and conclusive, I cannot approve the announcement of the majority.

We have a statute regulating the rights of the parties on the disruption of a Christian congregation, just and wise in its provisions, and to this these parties should be turned without touching the ecclesiastical appointments of the church, or in anywise adjudicating the church law.

If the action of the synod in appointing the committee, and its affirmance by the general assembly, be

regarded as judicial, they are beyond the control or review of the civil courts. If regarded as legislative, they are not only clearly authorized by the church law, and founded upon the high moral consideration of relieving the majority of the congregation from the unjust, arbitrary, and despotic conduct of its session; but if not, are equally beyond the control of our courts. So in any view the chancellor's order was right, and should not be reversed.